# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAFAYETTE DIVISION

SCOTT SHUMOCK                              CIVIL ACTION NO. 12-CV-520

VERSUS                                             JUDGE DOHERTY

MICHAEL J. ASTRUE,                          MAGISTRATE JUDGE HANNA
COMMISSIONER OF SOCIAL SECURITY

## REPORT AND RECOMMENDATION

Before the court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, it is recommended that the decision of the Commissioner be AFFIRMED.

### Background and Commissioner's Findings

On September 17, 2008, Scott Shumock filed applications for disability insurance benefits and supplemental security income benefits under Title II and Title XVI of the Social Security Act, alleging disability beginning January 10, 2006.  The agency initially denied his application, and Shumock requested a hearing before an Administrative Law Judge.  His request was granted, and a hearing was conducted on January 15, 2010, before ALJ Ronald L. Burton. [Tr. 28-52[1]] On June 24, 2010, ALJ Burton issued a decision, denying the claim. [Tr. 84-91] Shumock sought review of that decision by the Appeals Council, which acted on February 11, 2011 to vacate the hearing decision and

---

[1]The transcript of the administrative hearings and evidence introduced at the hearings are made a part of the record at Rec. Doc. 6-3.  Pages are numbered at the bottom right corner, and transcript/record references will be made in this document as Tr. __.

remand the matter for further consideration, based on new and material medical evidence

of cervical surgery after the hearing date and before the decision date and specific

instructions for further evaluation and consideration. [Tr. 98-100] A second hearing was

held before ALJ Lawrence T. Ragona on July 11, 2011, and another unfavorable decision

was rendered on September 15, 2011. [Tr. 7-22]  The Appeals Council denied review on

January 9, 2012, leaving ALJ Ragona's decision to stand as the final decision of the

Commissioner. [Tr. 1-5]  On February 27, 2012, Scott Shumock filed the instant

Complaint in this Court, seeking judicial review pursuant to 42 U.S.C. §405(g). [Rec.

Doc. 1] He is represented by counsel on this appeal.

## APPLICABLE  LEGAL STANDARDS  AND  SCOPE OF REVIEW

Any individual, after any final decision of the Commissioner of Social Security in

which he was a party may obtain a review of the decision by a civil action. 42 U.S.C.

405(g). This court's review of the Commissioner's decision that the claimant is not

disabled is limited to determining whether that decision was supported by substantial

evidence and whether the proper legal standards were applied in reaching that decision.

*Alfred v. Barnhart*, 181 Fed. App'x. 447, 449 (5th Cir. 2006); *Boyd v. Apfel,* 239 F.3d 698,

704 (5th Cir. 2001).  The ALJ is entitled to make any finding that is supported by

substantial evidence, regardless whether other conclusions are also permissible, and any

findings of fact by the Commissioner that are supported by substantial evidence are

conclusive and must be affirmed.  *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005);

*Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

‘Substantial evidence’ is such relevant evidence as a responsible mind might

accept to support a conclusion; it is more than a mere scintilla and less than a

preponderance.  *Boyd v. Apfel*, 239 F.3d at 704; *Carey v. Apfel*, 230 F.3d 131, 135 (5th

Cir. 2000).  A finding of no substantial evidence is appropriate only if no credible

evidentiary choices or medical findings support the decision.  *Boyd v. Apfel*, 239 F.3d at

704.  Finding substantial evidence does not involve a search of the record for isolated bits

of evidence that support the Commissioner's decision; instead, the entire record must be

scrutinized as a whole.  *Singletary v. Bowen*, 798 F.2d at 823. In applying this standard,

the court may not re-weigh the evidence in the record, try the issues *de novo*,  or

substitute its judgment for that of the Commissioner, even if the evidence weighs against

the Commissioner's decision.  *Boyd v. Apfel*, 239 F.3d at 704; *Carey v. Apfel*, 230 F.3d at

135; *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).  To determine whether the

decision to deny social security benefits is supported by substantial evidence, the court

weighs the following factors: (1) objective medical facts; (2) diagnoses and opinions from

treating and examining physicians; (3) plaintiff's subjective evidence of pain and

disability, and any corroboration by family and neighbors; and (4) plaintiff's age,

educational background, and work history. 42 U.S.C.A. §405; *Martinez v. Chater*, 64

F.3d 172, 174 (5th Cir. 1995).  Any conflicts in the evidence regarding the claimant's

-3-

alleged disability are to be resolved by the administrative law judge, not the reviewing court. *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).

*Disability* is defined in the Social Security regulations as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.§ 423(d)(1)(A). *Substantial gainful activity* is defined as work activity involving significant physical or mental abilities for pay or profit. 20 C.F.R. §404.1572(a)-(b).

In determining whether a claimant is disabled, the Commissioner uses a five-step sequential analysis, which requires analysis of the following:  (1) whether the claimant is currently engaged in substantial gainful activity (i.e., whether the claimant is working); (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals the severity of an impairment listed in 20 C.F.R., Part 404, Subpart B, Appendix 1; (4) whether the impairment prevents the claimant from doing  past relevant work (i.e., whether the claimant can return to his old job); and (5) whether the impairment prevents the claimant from doing any other work. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Masterson v. Barnhart*, 309 F.3d 267, 271-72 (5th Cir. 2002); *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).  See, also, 20 C.F.R. § 404.1520.  "Determining whether a claimant is disabled because of a mental condition under the above sequential process can be a difficult task." *Singletary v. Bowen*, 798 F.2d 818, 820 (5th Cir. 1986).

-4-

If the Commissioner determines that the claimant is disabled at any step, the analysis ends.  20 C.F.R. § 404.1520(a)(4). If the Commissioner cannot make a determination at any step, he goes on to the next step.  20 C.F.R. § 404.1520(a)(4). When assessing a claim for disability benefits in the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work.  *Sullivan v. Zebley*, 493 U.S. 521, 525, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990).  If the claimant is not actually working and his impairments match or are equivalent to one of the listed impairments, the Commissioner is required to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. §423(d)(2)(B).   The medical findings of the combined impairments are compared to the listed impairment most similar to the claimant's most severe impairment. *See Zebley*, 493 U.S. at 531, 110 S.Ct. 885.  It is the claimant's burden to prove at step three that his impairment or combination of impairments matches or is equivalent to a listed impairment. *Id.* at 530-31.  For a claimant to demonstrate that his disorder matches an Appendix 1 listing, it must meet all of the specified medical criteria.  An impairment that manifests only some of the specified criteria, no matter how severe, does not qualify. *Id.* Ultimately, the question of equivalence is an issue  reserved for the Commissioner. *Spellman v. Shalala*, 1 F.3d 357, 364 (5th Cir. 1993).

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity. 20 C.F.R. § 404.1520(a)(4). This is a determination of the most the claimant can still do despite his physical and mental limitations and is based on all relevant evidence in the claimant's record. 20 CFR § 404.1545(a)(1). The claimant's residual functional capacity is used at the fourth step to determine if the claimant can still do his past relevant work, and at the fifth step, it is used to determine whether the claimant can adjust to any other type of work. 20 CFR § 404.1520(e).  When a claimant's residual functional capacity is not sufficient to permit him to continue his former work, then his age, education, and work experience must be considered in evaluating whether he is capable of performing any other work.  *Boyd v. Apfel,* 239 F.3d 698, 705 (5th Cir. 2001); 20 C.F.R. § 404.1520.  The testimony of a vocational expert is valuable in this regard, as such expert "is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed."  *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986); *see also Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995).

The claimant bears the burden of proof on the first four steps, and then the burden shifts to the Commissioner on the fifth step to show that the claimant can perform  other substantial work in the national economy.   If the Commissioner  makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding. *Perez v.*

*Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

When a mental disability claim is made, such as bipolar disorder or major depressive disorder, the Commissioner utilizes a corollary sequential procedure for determining the merits of the claim.  Essentially, this procedure  substitutes specialized rules at Step 2 for determining whether a mental impairment is severe, and also provides detailed guidelines for making the Step 3 determination as to whether the mental impairment meets or exceeds the Listings.  The regulations require:

> [T]he ALJ to identify specifically the claimant's mental impairments, rate the degree of functional limitation resulting from each in four broad functional areas, and determine the severity of each impairment.  Furthermore, §404.1520(a)(e) provides that the ALJ must document his application of this technique to the claimant's mental impairments.  *Satterwhite v. Barnhart*, 44 Fed. Appx. 652 (5th Cir. 2002) (unpublished).

*Non-Exertional Impairments:*

Impairments that remain constant at all levels of exertion form an important  part of residual functional capacity.  These impairments are called non-exertional impairments, because the claimant suffers these impairments constantly, whether or not he exerts himself.  Allergies are non-exertional impairments, and may be severe. Intolerance to stress may also be a non-exertional impairment.  Side effects from medications have also been included in consideration as non-exertional impairments. Pain can be a non-exertional impairment when it exists whether or not the claimant is

exerting himself in physical activities. "Pain constitutes a disabling condition when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir.) (internal citations omitted).

## ANALYSIS AND DISCUSSION

*The Administrative Record:*

Details of the claimant's employment history appear in the record in several places. [Tr. 200-211, 219-220, 233-242, 256] Scott Shumock has worked doing hurricane cleanup, pizza delivery, bike building, floor installation, painting, carpentry and as a galley hand/cook and carpenter's helper. He can read, write, speak and understand English, and his reading/spelling and arithmetic achievements are at high school and post high school levels. [Tr. 222, 290] His IQ is at least 111. [Tr.223, 290] He completed a GED program, and he has a valid drivers license. [Tr. 250, 273,289] Records indicate Shumock was treated at Touro Infirmary after a rear-end collision on January 10, 2006. [Tr. 325-331] Dr. Keith Mack followed the claimant after the accident. [Tr. 332-339] By February 14, 2006, Shumock was taking Lortab, Soma, and Xanax, prescribed by Dr. Fruge, a pain management specialist. Dr. Michel Heard began treating Shumock in May, 2006.[Tr. 341-346] He recommended EMG/NCS studies with Dr. Franklin and an MRI of the lumbar spine. Otherwise, he recommended conservative treatment. On June 21, 2006, Dr. Heard, referencing the claimant's demands for a narcotic pain patch and his refusal to go to physical therapy, wrote "I will not see him back again for follow-up." [Tr. 341] Dr.

Franklin's results were normal. [Tr. 347-349] The MRI of the lumbar spine showed no significant disc bulge or protrusion, or foraminal stenosis at L1-2, 2-3, 3-4; disc degeneration and mild disc bulge; no foraminal stenosis; mild right facet arthrosis at L4-5; disc degeneration, moderately large focal right paracentral herniation and mild bulge causing stenosis at L5-S1. [Tr. 351] An MRI of the Cervical spine showed disc pathology at C5-6, C6-7, [Tr. 352] The MRI of the thoracic spine disc showed degeneration, without associated disc space narrowing or bulging. [Tr. 354]

Dr. Margaret Rice provided pain management treatment for the claimant from August, 2006 to March, 2008, with monthly visits. [Tr. 361-459] She recorded diagnoses of Cervicalgia and anxiety secondary to pain, with history of panic disorder. [Tr. 397] She prescribed Xanax, Soma, and Lortab, and she referred the claimant to LSU Orthopedic Clinic regarding his neck and mid-low back pain complaints. [Tr. 379]  In November, 2007, Dr. Rice released Shumock for light duty work as a delivery driver. [Tr. 384] On March 20, 2008, she discharged the claimant from her care, refusing to accepting him back into her practice, after drug tests indicated he was positive for THC and negative for the medications she had prescribed. [Tr. 362]

Dr. Greg Gidman performed a vocational rehabilitation evaluation in February, 2008. [Tr. 356-360]   He noted that the claimant was taking a "tremendous amount of medication."[Tr. 358] The claimant had denied history of drug or alcohol abuse in past. [Tr.359] Gidman's physical exam was normal, and he did not identify any surgical lesion

on examination or from reviewing MRIs of the cervical and thoracic spine. [Tr. 360] He opined that Shumock needed to be weaned off all narcotics.  He further opined that he found no anatomic abnormality to restrict the claimant from doing all normal activities at home and work.  Based on subjective complaints, he would limit Shumock to medium work, again opining that the claimant "very well might have a drug dependency problem."

On July 1, 2008, a Psychological Report was completed by psychologist F.T. Friedberg. [Tr. 461-463] He found that the claimant functions within the Bright Normal range of intelligence.  He found no indication of malingering or exaggeration, but he noted significant somatic complaints, with high levels of anxiety and moderate depression characteristics.  He recommended a referral for pain management and supportive counseling. Another psychological report was completed by psychologist C. Scott Eckholdt on July 3, 2008. [Tr. 465-468]  As of that date, Shumock reported he was not receiving any medical treatment.  He denied inpatient psychiatric treatment, but acknowledged inpatient treatment for significant marijuana use in 1996.  Mental status exam notes state that "the veracity of his report is somewhat questionable."   No pain behaviors were noted.  MMPI-2 test results showed some exaggeration and a profile consistent with somatic reactivity under stress.   Dr. Eckholdt opined that Shumock has the intelligence and capacity to perform well in a training program. He expressed concern that the claimant is in a "disabled" frame of mind and may be seeking some form of disability. [Tr. 467]

Dr. Ilyas Munshi is a neurosurgeon who treated the claimant from March 6, 2008 to July 22, 2008. [Tr. 469-491] A cervical MRI was interpreted to be consistent with a herniated disc at C5-6 and stenosis at C6-7 with neurologic compression.  The lumbar MRI was consistent with a herniated disc at L5-S-1, with neurologic compression.  On June 26, 2008, he discussed neck surgery with the claimant and his family. At his last visit with Shumock, the doctor recommended non-narcotic medications and continued psychological help. [Tr. 471]

Schumock was seen at University Medical Center for complaints of anxiety, chronic neck and back pain.[Tr. 492 -527]  In March, 2008, he exhibited withdrawal symptoms from Lortab, Xanax and Soma over four days. [Tr. 514]  He requested Lortab on September 26, 2008, refusing to take the medications he had been given the day before. [Tr. 495]

On August 25, 2008, a Vocational Evaluation Report was completed by T. Scott Smith. [Tr. 213-227, 272] The consultant recommended a sedentary work limitation, but he deferred to others for final work restrictions, and he indicated that Shumock would be a candidate for further training. [Tr. 223, 227]   On November 20, 2008, Dr. Scott Chapman conducted a Disability Evaluation at the request of Disabilty Determination Services. [Tr. 528-533 ] He took a history from the claimant, including the surgical recommendation by Dr. Munshi and Shumock's indication that he did not want to have the recommended neck surgery. [Tr. 528] Shumock also reported he had not had any mental health follow-up.  He

reported he was taking no prescribed medications. Dr. Chapman noted the diagnostic studies which confirmed multi-level disc disease and Shumock's history of psychological evaluation and diagnosis.  He noted that the claimant seemed to have been "lost to follow-up."

A psychological evaluation was conducted December 18, 2008, by Dr. David Greenway, on referral from DDS. [Tr. 534-536 ] Dr . Greenway found  "[H]e tended to exaggerate and endorse highly suspect symptoms," and records indicating a history of drug seeking in medical settings. [Tr. 534] The claimant reported he was taking no prescribed medications or undergoing any medical or mental health treatment. [Tr. 535] Dr. Chapman recorded diagnostic impressions of Axis I: fake bad response set, polysubstance dependency (putatively in remission); Axis II: history of antisocial behavior; Axis III: deferred; Axis IV: psychosocial problems, occupational problems: unemployed; and Axis V: GAF=65[2]. He concluded that Shumock "should be able to maintain competitive employment," tolerating normal work-related stress over a routine workweek. [Tr. 536]

On January 14, 2009, a Mental Residual Functional Capacity Assessment, Form SSA-4734-F4-SUP was completed by Joseph Kahler, PhD. [Tr. 539-556] No marked limitations were noted, and detailed elaborations were noted by the evaluator on the form

---

[2]GAF is a numeric scale(0-100, with 100 indicating no symptoms) used by mental health clinicians and physicians to rate subjectively the social, occupational, and psychological functioning of adults.  American Psychiatric Ass'n Diagnostic and Statistical Manual of Mental Disorders at 32 (4th ed. 1994) ("DSM–IV").  A GAF score of 65 indicates mild psychological symptoms, which may include depressed mood and mild insomnia or some difficulty in social, occupational or school functioning.   DSM–IV at 34.

as required. He opined that the claimant "would appear to be capable of moderately complex work under close supervision, with few social demands." [Tr. 541] He noted the presence of substance addiction disorders, prompting the further evaluation and determination that a medically determinable impairment is present that does not precisely satisfy the diagnostic criteria for 12.04 and 12.08. [Tr. 546] He opined that the evidence does not establish the presence of the "C" criteria. [Tr. 554] He further opined that the claimant's allegations regarding the nature, severity, source, and persistence of mental symptoms are not fully credible. [Tr. 555]

As of January 11, 2010, the claimant was not taking any prescribed medications. [Tr. 286]  In March, 2010 (after the first ALJ hearing), Shumock was seen at LSU Emergency Department in Shreveport, with complaints of  numbness, tingling, and an inability to use his right hand.  He reported his lumbar disc disease was stable.  [Tr. 559-561] MRI of the cervical spine showed osteophyte and disc bulging compromising the right anterolateral space at C6-7. [Tr. 559] A diagnosis of cervical disc disease was recorded. [Tr. 561]  In the spring of 2010, Shumock was seen by Dr. Cher Aymond, in the Maurice Community Clinic. [Tr. 562-566] On May 21, 2010, he was admitted to LSU Health Sciences Center in Shreveport to undergo an anterior cervical fusion. [Tr. 567-686] On discharge on May 23, 2010, he was reporting improvement in his hand numbness and improvement in his low back pain. [Tr. 571] From April through October, 2010, Shumock received physical therapy.  On November 2, 2010, the claimant was treated at Abbeville

-13-

General Hospital, complaining that he "pulled his back again" and he reported postnasal sinus drip and nasal congestion. [Tr. 967] He reported that he was doing well postop from cervical surgery and moving all of his extremities.  His pain had decreased a great deal after the surgery.  On examination by Dr. Aymond, Shumock's bilateral straight leg raising test was negative.  He had thoracic paraspinal muscle spasms, suspected to be caused by the claimant's lack of movement. [Tr. 968]  He asked about physical therapy, and that treatment was authorized. [Tr. 894-895]

On November 28, 2010, the claimant was seen in the Emergency Room of Lafayette General Medical Center with complaints of back pain.  A final impression of acute exacerbation of chronic low back pain and chronic dysuria was recorded, and Shumock was advised to follow up with his regular physician. [Tr.886-887] On December 1, 2010, Shumock began another program of physical therapy through Our Lady Of Lourdes Regional Medical Center. [Tr. 910] Notes from PT sessions document scattered symptom response and the claimant's inability to describe his symptoms, including Shumock's repeated comments that "he doesn't mind working, but can't under current level of pain;" [Tr. 905] Shumock was "a little ambiguous and forgetful." [Tr. 905] He reported his low back was doing better as of December 28, 2010, and progress was noted to be significant on January 5, 2011[Tr. 906, 913].  By January 11, 2011, Shumock rated his pain at 1/10, but reported anxiety problems. By February 7, 2011, physical therapy was

noted to be "no longer indicated," secondary to no significant progress and only 56% attendance compliance. [Tr. 907, 914]

On January 3, 2011, Shumock was seen the the Emergency Room at Lafayette General Medical Center for complaints of palpitations and feeling shaky.  His physical examination was essentially normal, as was a CT scan of the brain, leading to a diagnostic impression of anxiety attack. [Tr. 880-883] On January 17, 2011, he was seen in the Emergency Room of Our Lady of Lourdes Medical Center with similar complaints and a normal examination, except for the history reported by the claimant. [Tr. 941] He was given a prescription for Vistaril and advised to follow up with his primary care physician.

As of April 27, 2011, Shumock took Claritin for allergies and eye drops for dry eyes.  He took Tylenol for pain as needed.  No other prescription medications were documented by the claimant. [Tr. 313] On April 29, 2011, Shumock called to complain about "nerve damage by his waist," and an appointment was scheduled for May 19, 2011 at LSU Health Sciences Center in Shreveport.  At that time he reported that he had low back pain and right leg pain.  Physical therapy had been effective, but Shumock reported his pain had returned.  An MRI of the lumbar spine showed disc dessication with central herniation and thecal sac compression at L5-S-1.  His examination was normal except for a positive straight leg raise result on the right side.  Another course of physical therapy was recommended. [Tr. 976]  On June 1, 2011, in a physical therapy evaluation at the Regional Medical Center of Acadiana, Shumock described good outcomes from his prior PT, and he

-15-

reported his back pain as 3/10 at least, 8/10 at worst. Bilateral leg strength, on examination, was noted to be 5/5. It was recommended that Shumock pursue conservative physical therapy for a 12 week period. [Tr. 990] By July 11, 2011, the claimant was prescribed lorazepam (for anxiety), tramadol (for pain), fluticasone nasal spray, and loratadine (for allergies).  The prescribing physician was Dr. Aymond. [Tr. 314]

*The Administrative Hearing:*

The second administrative hearing began July 11, 2011 with the introduction, without objection, of documentary evidence into the record. [Tr. 56] Scott Shumock's testimony established that he was 33 years old, with a birth date of February 27, 1978. He is 6'0" tall and weighed 143 pounds. He lived with his parents and had no income. [Tr. 57] He has a GED diploma, and he can read, write and do basic arithmetic.  He is able to drive. He last worked in 2007, when he did some carpentry helper work and delivered pizza.  He believes he lost mobility from the May, 2010 cervical surgery.  He has also sought medical treatment for back pain, including physical therapy, which has helped in strength-building, but it has not relieved his pain.  [Tr. 58-59] He uses no back brace or other orthopedic device. [Tr. 60] He does very little exercise on his own.  He would not lift more than 10 pounds; he can walk about a quarter of a mile and stand 15-30 minutes.  He spends most of his time in a recliner. [Tr. 60, 64] He can ride in a car about an hour and a half before needing to take a break. [Tr. 62] He is "not real social;" he smokes a pack of cigarettes a day; he does not drink and denied using illegal drugs. [Tr. 63] He spends a few hours a day

on the computer, on Facebook. [Tr. 64] Shumock testified that he has panic attacks, which come from nowhere. [Tr. 62] He has tried various medications to address his anxiety, including Vistaril and Lorazepam, prescribed by his primary care physician, Dr. Aymond. She also prescribes Tramadol for pain relief. [Tr. 63-64, 66] He believes his anxiety is a big problem interfering with his ability to work. [Tr. 65] He has thought about web designing, but he knows nothing about it.  He stated he is "trying to think of something that might not hurt me." [Tr. 66]  Shumock testified that over the past six months, his allergies are becoming a big issue.  His eyes get dry, and nasal spray makes him dizzy. His allergy medications make him sleep during the day. [Tr. 66-67]

In response to questions from his attorney, Shumock recalled having worked as a flagman, but he could not do that kind of work presently, since he would have to stand all day. [Tr. 67] He testified that doctors have discussed surgery to address his back/leg problems, if the current epidural treatments (3 injections) are not successful. [Tr. 68] The more he does, the more he hurts. [Tr. 69]  In a typical week, Shumock testified he may not get out of bed one day, due to anxiety.  His medications are not helping, and he stresses out over small things. [Tr. 70] He worries about family finances and his father's health. He has a girlfriend on Facebook, who lives in another country, and she stresses him out. [Tr. 70]

Thomas LaFosse was called as a vocational expert by the ALJ.  He confirmed his understanding of his role as an impartial witness, his familiarity with jobs both in the local

and national economies, and his review of the claimant's file. He also heard the claimant's testimony. [Tr. 71] The VE explained his review of the claimant's vocational history to identify work that he has performed and the exertion/skill levels of that work.  The claimant's past work as a carpenter's helper from 1996-98, was described by the expert as heavy work.  His past work as a painter in the construction industry was considered to be medium work. [Tr. 71] His work as a bike assembler was medium work. His work as a galley hand was considered medium work.  His work as a flagman is light work, and his work in pizza delivery was considered to be medium work. [Tr. 72]

The expert was asked to assume a person of the claimant's age, education and work experience, further assuming that he could lift/carry 20 pounds occasionally and 10 pounds frequently.  He could stand and walk for about six hours and sit for six hours.  He could not do over-shoulder work.  Because of emotional problems, he could not do complex work, and he needed limited interaction with the general public, working more with things than with people.  On those assumptions, the VE opined that the claimant could not do any of his former jobs, except for the position of flagman, which is light work and does not involve much interaction with the public. [Tr. 72] He testified that there are nevertheless other jobs in the national economy which the claimant could do, identifying the area of factory/warehouse work and the position of bakery conveyor worker, a light, unskilled position with about 15,000 available jobs in the national economy.  He also identified the positions of fruit distribution conveyor, also light, unskilled, with 7,500 available jobs in

the U.S. and blending tank tender in beverage/grain companies, with about 20,000 available jobs in the U.S. [Tr. 72-73]

The ALJ next asked the expert to assume that the person was limited to sedentary-type occupations.[3]  He could lift/carry 10 pounds occasionally, five pounds frequently.  He could stand and walk for about two hours, sit for about six hours.  He could do no over-shoulder work and no complex work, and he must have limited interaction with the general public.  In response, the VE indicated that if that person could drive, he could be an escort driver, a sedentary, unskilled position, with 141,000 available jobs in the United States.  He could also do general table/bench work, sedentary, unskilled positions, with 13,200 jobs in the U.S. [Tr. 73]  Finally, the ALJ asked that the VE consider the added limitation that the person may have to stay in bed one day a week, with that occurring fairly regularly.  The VE then opined that such a person would be unable to maintain employment, adding that if the person experienced anxiety flare-ups on a fairly regular basis, precluding him from following even simple instructions, then he would be below the competitive level for employment. [Tr. 74]  In response to questions by the claimant's attorney, the VE opined that if you backed away the jobs associated with a production rate (for stress reduction), then that limitation would eliminate roughly 1/3 to 1/2 of the unskilled, sedentary jobs. [Tr. 74]

***The Determination of the ALJ:***

---

[3]If an individual is determined to be able to do light work, it is assumed that he/she can also do sedentary work. 20 C.F.R. §§ 404.1567(b) and 416.967(b).

The record  demonstrates that the ALJ followed the requisite five step sequence in analyzing the claims of Scott Shumock.  He found, at step one, that the claimant has not engaged in substantial gainful activity since January 10, 2006, the alleged onset date.  This finding is supported by the record.  At step two, the ALJ determined that Shumock has the severe impairments of disorders of the cervical spine, lumbar spine, and anxiety (20 C.F.R. §§404.1520(c) and 416.920(c)). [Tr. 13] In support of that finding, the ALJ cited the claimant's testimony and the extensive medical record of complaints, treatments, recommendations and opinions of numerous physicians and psychologists who have treated and evaluated the claimant since a motor vehicle accident in 2006 and through mid-2011. [Tr. 13-16] At step three, the ALJ determined that the claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1(20 C.F.R. §§416.920(d), 416.925, and 416.926).  He referenced that no examining or non-examining physician had noted a listed impairment or equivalency to a listing, and he also noted that the State Agency medical consultants who evaluated the claimant's impairments have reached the same conclusion. He specifically found that the claimant's mental impairment does not meet or medically equal the criteria of listing 12.06. [Tr. 17] The ALJ performed the requisite "paragraph B" analysis to consider the severity of Shumock's mental impairment, finding that because the claimant's mental impairment does not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of

decompensation, each of extended duration, the "paragraph B" criteria are not satisfied. [Tr. 17]  He also determined that the evidence fails to establish the presence of the "paragraph C" criteria. [Tr. 17] These findings are consistent with those of the initial state agency determination of January 14, 2009. [Tr. 539-557]  The claimant has not challenged this finding, which resulted from application of the correct legal standards, and is supported by substantial evidence in the record.  The ALJ then, after considering the entire record, found that the claimant has the residual functional capacity (RFC) to perform a modified range of light work as defined in 20 C.F.R. §§404.1567(b) and 416.967(b), except he would be capable of lifting and carrying 20 pounds occasionally and 10 pounds frequently; capable of standing and walking six hours out of an eight-hour workday; capable of sitting six hours out of an eight-hour workday; unable to perform over the shoulder work; and because of emotional problems, he could not do complex work and should have limited interaction with people. [Tr. 18] In arriving at the RFC, the ALJ followed the required two-step process to determine (1) whether there is an underlying medically determinable physical or mental impairment which could reasonably be expected to produce the claimant's pain and other symptoms, and (2) whether the claimant's reports concerning the intensity, persistence and limiting effects of his symptoms are credible and substantiated by the objective medical record. He concluded that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity,

-21-

persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the RFC. [Tr. 18] The claimant has challenged this finding. At step four, the ALJ found that Scott Shumock has vocationally relevant past work experience, but his current RFC precludes him from performing that work. [Tr. 21]  At step five, the ALJ found that after considering his age, education, work experience, and the RFC, there are nevertheless jobs existing in significant numbers in the national economy that the claimant could perform. [Tr. 21] This finding was made with the assistance of a vocational expert. Thus, per the ALJ, the claimant has not been under a disability as defined in the Social Security Act, from January 10, 2006, through the date of the decision on September 15, 2011. [Tr. 22]  The claimant challenges this finding.

### ASSIGNMENT OF ERRORS

The claimant asserts that the Administrative Law Judge committed error in (A) finding that Scott Shumock's allegations of pain and other symptoms are not fully credible, and (B) in ignoring the claimant's descriptions of his physical and mental limitations to find that there are jobs existing in significant numbers in the national economy that Scott Shumock can perform.

***The ALJ's credibility determination is supported by substantial evidence and comports with applicable law.***

The task of weighing the evidence is in the sole province of the ALJ.  It is within the ALJ's discretion to determine the disabling nature of a claimant's pain, and the ALJ's

determination is entitled to considerable deference.  See *Chambliss v. Massanari*, 269 F.3d 520, 522-523 (5th Cir. 2001). "Pain is considered a disabling condition when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994) (internal citations omitted).  It is well-settled that the ALJ need not give greater weight to a claimant's subjective complaints than to the objective medical evidence. *Id.* at 164.  Further the ALJ may discount a claimant's subjective complaints if there are inconsistencies between the alleged symptoms/limitations and the evidence as a whole.  *Vaughn v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995).  On the issue of the claimant's credibility, the ALJ found that Shumock's medically determinable impairments could reasonably be expected to produce his alleged symptoms.  Consequently, the ALJ was required to evaluate the  intensity, persistence, and limiting effects of his symptoms.  "This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects." SSR 96-7p, *1  The regulations state:

> The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. SSR 96-7p, *4.

The Fifth Circuit has held that although an ALJ "is bound . . . to explain his reasons for rejecting a claimant's complaints of pain," he is not required to "follow formalistic rules in his articulation." *Falco v. Shalala*, 27 F.3d at 164 (5th Cir. 1994).  In making the credibility determination, the ALJ may consider a claimant's noncompliance with prescribed treatment,

and a claimant's unwillingness to try all forms of relief offered. 20 C.F.R. §§404.1530, 416.930; *Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990).  He may also consider the effectiveness of treatment. *Johnson v. Sullivan*, 894 F.2d 683, 686 (5th Cir. 1990).  He may keep in mind a tendency on the part of a claimant to exaggerate symptoms to obtain benefits. *Frey v. Bowen*, 816 F.2d 508, 517 (10th Cir. 1987).  He may discount a claimant's credibility for inconsistencies between subjective testimony and objective evidence. *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001; *Reyes v. Sullivan*, 915 F.2d 151, 155 (5th Cir. 1990).  Evidence that a claimant receives only conservative treatment substantially supports an ALJ's adverse credibility finding against complaints of incapacity and severe symptoms. *Parfait v. Bowen*, 803 F.2d 810, 813-14 (5th Cir. 1986).

In this case, the ALJ clearly questioned some of the claimant's representations and subjective reports.  He found it difficult to reconcile the claimant's self-reported degree of pain and limitation with the objective evidence and the opinions recorded by both treating and evaluating physicians and other professionals. [Tr. 18-21] He made particular references to the absence of any active mental health treatment for the claimant's anxiety complaints, with the only medication prescribed for anxiety coming from Shumock's family physician. [Tr. 19] He noted the claimant's report of good results from his neck surgery, the reported benefits to the claimant from physical therapy, and the absence of any recommendation for lumbar spine surgery. He noted that Shumock takes a non-narcotic medication for pain presently, and his record contains no restrictions placed upon the claimant by Dr. Aymond or LSU Medical

Center, the primary providers of recent treatment for the claimant. He further cited the significant history of assessments by multiple professionals that Shumock was considered to be poor to moderately reliable as a reporter of his functional status, to exaggerate his symptoms, and to engage in drug-seeking behaviors, as set out in detail in the record.  The undersigned finds that the ALJ's narrative was sufficient on this issue, and his credibility decision is based on substantial evidence.

### The ALJ properly made the step 5 determination.

The use of a vocational expert is appropriate when the analysis moves to step five and a determination must be made of whether the claimant's skills can be used in other work and of what other specific jobs are possible for the claimant and available to him. 20 C.F.R. §404.1566(e).  In this case, the determination was made with the assistance of VE Thomas LaFosse, who responded to hypothetical questions from the ALJ in the course of his testimony, as described in detail above.    The claimant argues that in considering the testimony of the VE in this case, the ALJ failed to consider factual evidence that Shumock's symptoms and conditions would cause him to miss several days of work each month, as the work itself would aggravate his physical and mental states. [Rec. Doc. 9, p. 6] Yet, Claimant offers no record citations to the referenced limitation beyond Shumock's hearing testimony, which the ALJ considered and rejected.  The ALJ relied on opinions of David Greenway, PhD, that Shumock "should be able to maintain competitive employment" [Tr. 15]; treating physician Cher Aymond, M.D. who placed no limitations on the claimant [Tr. 20]; Dr.

-25-

Margaret Rice, who found he could do light duty work [Tr. 14]; and the records from Claimant's treating source since 2008, LSU Medical Center, containing no restrictions placed on the claimant to conclude that Shumock could sustain employment within the RFC. [Tr. 20]

At the hearing, the ALJ asked multiple hypothetical questions of the VE, beginning with the question which mirrored the documented RFC.  [Tr. 18, 72] In response to that question, the VE described three types of work existing in significant numbers in the national economy which Shumock could do.[4] [Tr. 72] A second hypothetical question suggested limits to sedentary work, and two types of work were identified which the claimant could do. [Tr. 73] The final question included the limitation that the claimant would miss one day a week, fairly regularly, incorporating the claimant's testimony that he occasionally stayed in bed due to anxiety.  It is well-settled that an ALJ is not bound by vocational expert testimony which is based upon hypothetical assumptions that are rejected by the ALJ. *See Owens v. Heckler*, 770 F.2d 1276, 1282 (5th Cir. 1985).  The ALJ need only incorporate into the hypothetical questions posed to a vocational expert those claimed disabilities that are supported by the evidence and recognized by the ALJ.  Thus, it is not significant that the ALJ rejected the VE's testimony regarding the claimant-preferred expanded hypothetical.  *Masterson v. Barnhart*, 309 F.3d 267, 273 (5th Cir. 2002)*;  Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994); *Owens v. Heckler*, 770 F.2d 1276, 1282 (5th Cir. 1985).  Only the question which posed the

---

[4]Work exists in the national economy "when there is a significant number of jobs(in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications." 20 C.F.R. §416.966(b).

hypothetical containing the elements of the ALJ-determined RFC needed to be asked.   On

that record, the undersigned finds no fault with the ALJ's step 5 method or conclusions.

### CONCLUSION AND RECOMMENDATION

It is well-established that "the ALJ has sole responsibility for determining a claimant's

disability status." *Martinez*, 64 F.3d at 176, *citing Moore v. Sullivan*, 919 F.2d 901, 905 (5th

Cir. 1990). As discussed above, this Court's standard of review is (1) whether substantial

evidence of record supports the ALJ's determination, and (2) whether the decision comports

with relevant legal standards. *Villa v. Sullivan*, 895 F.2d 1019, 1021(5th Cir. 1990).   In the

instant case, the record demonstrates that the proper legal standards were applied to

consideration of Scott Shumock's claims, and the undersigned cannot conclude that the ALJ

failed to base his determination on substantial evidence, that is evidence which is more than

a mere scintilla and less than a preponderance. *Boyd v. Apfel,* 239 F.3d  at 704.

Applying the appropriate review standard to the record of the instant case,

**IT IS THE RECOMMENDATION** of the undersigned that the decision of the

Commissioner be AFFIRMED.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b),

parties aggrieved by this recommendation have fourteen days from receipt of this report and

recommendation to file specific, written objections with the Clerk of Court.  A party may

respond to another party's objections within fourteen days after receipt of a copy of any

objections or responses to the district judge at the time of filing.

-27-

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plan error.  See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

Signed in Lafayette, Louisiana, this 1st day of March, 2013.

_____

Patrick J. Hanna
United States Magistrate Judge

-28-